UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
Appellants,

        -against-

 

Appellee.
----------------------------------------------------------------X
FEUERSTEIN, J.

**OPINION AND ORDER**
14-cv-3700, 14-cv-3713,
14-cv-3714, 14-cv-3873,
14-cv-3874, 14-cv-3876,
14-cv-3878, 14-cv-3879,
14-cv-4450 (SJF)

        Appellants appeal from orders entered April 24, 2014 (the "April 24, 2014 Orders") by

the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy

Court") which found that Appellants did not hold "true participations" and granted summary

judgment in favor of Israel Discount Bank of New York ("IDB" or "Appellee").

I.      BACKGROUND

        A.     The Parties

        Oak Rock Financial, LLC ("Oak Rock" or "Debtor") is a Delaware limited liability

company with its principal place of business at 3900 Veterans Highway, Suite 351, Bohemia,

New York 11716. [Adversary Proceeding 13-08709, Docket Entry No. 44 ¶ 2]. Oak Rock "is an

asset-based lending company that provides financing to third parties pursuant to financing

installment contracts for the purchase of goods ranging from automotive products, furniture and

electronics to equipment and appliances." April 10, 2014 Supplemental Findings of Fact and

Conclusions of Law ("Supplemental Findings"), at 3; [Bankruptcy Case 8:13-bk-72251

("Bankruptcy Docket"), Docket Entry No. 61 (Declaration of Clifford Zucker in Support of

Chapter 11 Petition and First-Day Motions ("Zucker Decl.") ¶ 9)]. Oak Rock's business model

involves borrowing money from both commercial banks and private investors which it then loans

to selected dealers, who in turn use the funds to finance installment contracts for the purchase of consumer goods or to extend small business loans. Zucker Decl. ¶ 9.

IDB is a New York State chartered, FDIC insured full-service commercial bank, with its principal place of business located at 511 Fifth Avenue, New York, New York. [Adversary Proceeding 13-08709, Docket Entry No. 44 ¶ 1]. IDB is the agent for a group of banks financing Debtor's operations. Supplemental Findings, at 2.

Appellants are various individuals and/or entities that are parties to financing agreements with the Debtor labeled "participation agreements." Supplemental Findings, at 1. The Appellants and the associated district court and Bankruptcy Court case numbers are provided below:

- District Court Case No. 14-03700/Bankruptcy Case No. 13-08079 – Eric Rothenberg, Alisse Rothenberg, Jeffrey Rapaport, Shelley Saftler, Corey M. Saftler, Corey Mr. Saftler CGM IRA Custodian, Laura Kaplan, Arlene Saftler, Jane Doe No. 1, as custodian or trustee of Eric Jay Rothenberg Rollover IRA and Jane Doe No. 2, as trustee of Jeffrey Rapaport M.D. Defined Benefit Profit Sharing Plan (the "Rothenberg Appellants");

- District Court Case No. 14-03713/Bankruptcy Case No. 13-08102 – "POS Funding"

- District Court Case No. 14-03714/Bankruptcy Case No. 13-08154 – Alan Guber, Florence Guber, and Jacalyn Weidhorn, (the "Guber Appellants");

- District Court Case No. 14-03873/Bankruptcy Case No. 13-08103 – the Brown Family Group (together with Rose McGeever, the "Brown Appellants");

- District Court Case No. 14-03874/Bankruptcy Case No. 13-08077 – ZFI Endowment Partners, L.P. ("ZFI");

- District Court Case No. 14-03876/Bankruptcy Case No. 13-08078 – U.S. Small Business Administration as Receiver for Redstone Business Lenders LLC ("Redstone"), Finquest, Inc., Birnberg Group of Florida, Inc., the Birnberg Foundation, Jack Birnberg, as trustee of the Michal Birnberg Trust, and Louise Birnberg, as trustee for the Jack Birnberg Trust (the "Birnberg Appellants");

- District Court Case No. 14-03878/Bankruptcy Case No. 13-08157 – Estate of Elinor Yagerman, James J. Gries Supplemental Trust Fund A/K/A Estate of James Gries,

Clinton Brown III, John Grillo Natalie Grillo, as an individual, Natalie Grillo as custodian for Emily Grillo, Natalie Grillo as custodian for Christopher Grillo, Natalie Grillo as custodian for Matthew Grillo, Natalie Grillo as custodian for Samantha Grillo, Christian Garsault, Maria Garsault, Elena Fischer, Robert Waynes, Margarita Cardwell, Miriam Cardwell, Lizbeth Garcia a/k/a Lizbeth Garcia Mesa, Charles Cobb, as an individual, Jennifer Cobb, Charles Cobb as custodian for Tyler Cobb, Charles Cobb as custodian for Caitlyn Cobb, Rose McGeever, Lauren Clark, and William Clark (the "Yagerman Appellants");

- District Court Case No. 14-03879/Bankruptcy Case No. 13-08119 – Laurence and Maureen Cox (the "Cox Appellants"); and

- District Court Case No. 14-04450/Bankruptcy Case No. 13-08078 – Redstone and Birnberg Appellants)

B.    Relevant Agreements

    1.    Oak Rock Credit Agreement

IDB, as lender and agent, various lenders and Oak Rock are parties to an Amended and Restated Credit Agreement dated May 27, 2011 (as amended and modified, the "Credit Agreement"). [Bankruptcy Docket, Docket Entry No. 5 (Declaration of Jerry Hertzman ("Hertzman Decl.") ¶ 11) and the exhibits thereto]. The lenders under the Credit Agreement agreed to provide to Oak Rock a revolving credit facility with a maximum credit of ninety-six million dollars ($96,000,000.00). Hertzman Decl. ¶ 13. Oak Rock also executed and delivered to IDB an Amended and Restated Security Agreement dated May 27, 2011 (the "Security Agreement") which restates a security interest in favor of IDB in all of Oak Rock's rights, title and interest in, *inter alia*, "All Accounts, Loan Receivables and all records, documents, collateral and other property related thereto," in addition to "all Collections and other monies due and to become due under the Client/Dealer Loan Agreements or otherwise." Hertzman Decl. ¶ 13 and Ex. C (Security Agreement § 3(a)(i)).

## 2. Oak Rock Dealer Loans

Part of Oak Rock's business model involved borrowing money from commercial banks and private investors which it then loaned to selected dealers. Zucker Decl. ¶ 9. In order to secure a loan from Oak Rock, a dealer agreed to follow Oak Rock's procedures, use approved retail contracts and was willing to personally guarantee the performance of all of the contracts that it wrote. *Id.* ¶ 10. Oak Rock offered dealers a revolving credit line upon execution of a loan, security and service agreement, which explained the credit line terms and conditions and granted Oak Rock a priority security interest in all of the dealer's assets. *Id.* The dealers also executed personal guarantees of all obligations due to Oak Rock from the dealership. *Id.*

Oak Rock entered into agreements with the following dealers: (i) Patriot's Home & Auto Outfitters, Inc.; (ii) Auto Underwriters of America, Inc. ("Auto Underwriters"); (iii) Gateway Acceptance; (iv) M.K. Auto, Inc.; (v) Special Financing Co, LLC and Out of the Box Financing, LLC; (vi) The College Network/United First Federal Funding Corp.; (vii) NowAuto Group, Inc.; (viii) Earth Wind & Solar, Inc.; (ix) Magic Moments d/b/a Platinum Acceptance, (x) RAS Group, Inc. and Century Liquidation, Inc.; (xi) North Shore Leasing and Funding Corp.; (xii) U.S. Military Loans, Inc.; (xiii) Merchants Advance, LLC and AmeriMerchant LLC ("Merchants Advance"); (xiv) XRIMS, LLC ("XRIMS"); (xv) The Junction, Inc., Help Me Ride, Inc.; (xvi) EZ Auto Rental, Inc.; (xvii) Gungho Investments of Colorado Springs, Inc. d/b/a The Alternate Source; (xviii) Nuevo Mundo Sales and Financing, LLC and Diamond Hot Rimz, LLC; (xix) Great Lakes Financial LLC; and (xx) Allied Financial Investments (collectively, the "Dealer Loan Agreements").

3. Alleged Participation Agreements

   a. Alleged Participation Agreements

Each Appellant other than ZFI (the "Alleged Participants") entered into an agreement titled "Participation Agreement" (the "Alleged Participation Agreements") pursuant to which each Appellant purchased a "participating interest" in varying amounts in certain of the Debtor's financing agreements with the above-listed dealers. As noted by the Bankruptcy Court, each of the Alleged Participation Agreements contain paragraphs with the same or similar language including those set forth below.

Paragraph 1:

There are three different variations of paragraph 1:

   a. Oak Rock hereby grants, bargains, sells and assigns to Participant as of this date for $_____ a participating interest in the Agreement.....The participating interest shall bear interest at the rate of _____ percent (_____%) per annum and shall be repayable to Participant in twenty-four equal monthly installments of $_____ commencing on _____.

   b. Oak Rock hereby grants, bargains, sells and assigns to Participant as of this date for $_____ a participating interest in the Loan Agreement for a term of _____ year. The participating interest shall bear interest at the rate of _____ percent ($_____ %) per annum and shall be repayable to the Participant at the end of each calendar month commencing on _____.

   c. Oak Rock hereby grants, bargains, sells and assigns to Participant as of this date for $_____ a participating interest in the Loan Agreement for a term of _____ year. The participating interest shall bear interest at the rate of _____ (_____ %) per annum. Interest due to the Participant shall be added to Participant's participation balance at the end of each calendar month commencing _____.

Paragraph 5:

Oak Rock shall use its best efforts to conduct all transactions in accordance with sound practice and within the terms of the underlying agreements. Both parties hereto expressly understand and agree that no representations or warranties have been made with respect to the validity or adequacy of any collateral and that each party hereto has no recourse whatsoever to the other party excepting only for breach of this agreement, breach of trust or malfeasance.

Paragraph 6:

All compensation for the above transactions as and when actually received shall be divided between the parties hereto in proportion to their respective participating interest, except as follows: On the principal amount of Participant's participating interest, compensation is to be paid at a rate per annum of ____ %. Any and all losses shall be borne by and divided between us in proportion to our respective participating interests.

b.     ZFI Alleged Participation Agreement

ZFI and Oak Rock entered into an agreement (the "ZFI Alleged Participation Agreement") on March 30, 2013 whereby ZFI agreed to purchase from Oak Rock for a renewable one-year term "without recourse, an undivided fractional interest" in Oak Rock's dealer agreement with Merchants Advance. [Adversary Proceeding 13-8077, Docket Entry No. 61-3 (the "ZFI Alleged Participation Agreement") ¶ 1.2]. The parties agreed that ZFI's participation would not "exceed the lesser of (i) One Million Dollars ($1,000,000.00) or (ii) three and sixth-tenths percent (3.60%)" of the loans, advances, and other extensions of credit by Oak Rock to Merchants Advance. *Id.* ¶ 2.1.

Pursuant to the ZFI Alleged Participation Agreement, Oak Rock would "transmit to [ZFI], as and when collected, as [ZFI's] share thereof, an amount equivalent to interest computed upon Participation's outstanding investment in the Advances at the rate of thirteen percent (13.0%) per annum (the "Participation Rate"), payable at the end of each calendar month." *Id.* ¶ 3.4. If Oak Rock made any payment to ZFI "in anticipation of the receipt of funds from [Merchants Advance] and such funds [were] not actually received or applied by Oak Rock on the date payment [was] due," ZFI was required, "on demand from Oak Rock, [to] forthwith return to Oak Rock any such amounts transferred to [ZFI] by Oak Rock plus interest accrued thereon from and including the day such amount were transferred by Oak Rock to [ZFI] but excluding the day such amounts are returned by [ZFI], at a rate per annum equal to the Participation Rate." *Id.* ¶

6

3.5. If Oak Rock was "required at any time to return to [Merchants Advance] (as debtor in possession or otherwise) or to a trustee, receiver, liquidator, custodian or other similar official any portion of the payments made to Oak Rock," then ZFI was required, "on demand of Oak Rock, [to] forthwith return to Oak Rock the corresponding amount of any payments transferred to Participant hereunder, but without interest on such payments unless Oak Rock has been required to pay interest on such amounts to the person recovering such payments." *Id.* These obligations of ZFI were to "survive repayment of all amounts due under the Financing Agreements and the termination of this Agreement." *Id.*

The ZFI Alleged Participation Agreement required Oak Rock to retain payments received from ZFI "as custodian for the benefit of [ZFI]" (*id.* ¶ 3.6) and to provide a monthly accounting regarding Oak Rock's disbursements to and receipts from Merchants Advance. *Id.* ¶ 3.2. All costs and expenses of collection were to be borne by Oak Rock, except that out-of-pocket costs and expenses of collection by outside agencies or attorneys, court costs and the like were to be borne by Oak Rock and Participant "pro-rata in accordance with their respective Participations." *Id.* ¶ 3.7. Oak Rock was given the "right to manage, perform and enforce the terms of the Financing Agreements and to exercise and enforce all privileges and rights exercisable or enforceable by it thereunder according to Oak Rock's discretion and the exercise of its business judgment including without limitation the right to renew, extend, modify, compromise or release any obligation of Client or any guarantor, provided, however, that during the stated term of the Financing Agreements, Oak Rock shall not, without Participant's prior written consent, which consent shall not be unreasonably withheld or delayed, take any action which would (i) modify the date fixed for or amount of any payment of principal, interest or extension fee; (ii) reduce (except as required by the Financing Agreements in the ordinary course) the interest rate payable

thereunder; (iii) release (except as contemplated under the Financing Agreements in the ordinary course) or subordinate any interest in the Specific Collateral; or (iv) release the Client or any other party from personal liability, if any, under the Financing Agreements; but nothing herein shall be deemed to confer upon Participant the right to bar Oak Rock from renewing or extending the Financing Agreements at the end of the stated term thereof on such terms and conditions as Oak Rock may elect." *Id.* ¶ 4.1. Oak Rock was to "exercise the same care as it normally exercises with respect to loans, advances or other extensions of credit in which no participation are sold, but Oak Rock [was to] have no further responsibility to [ZFI] except as provided [therein], except for its own willful misconduct." *Id.*

The ZFI Alleged Participation Agreement provided that the Participation and each Participated Advance was "acquired by Participant without recourse to Oak Rock and for Participant's own account and risk" (*id.* ¶ 4.4) and that Oak Rock "does not guarantee the repayment of any Participated Advance and makes no representations or warranties, express or implied, as to, and shall have no responsibility for, the due authorization, execution, or delivery of the Financing Agreements or related documents by Client or any other person; the value, legality, validity, sufficiency, enforceability or collectibility of any Participated Advance, the Specific Collateral, or any other collateral or other support for the Participated Advances; any representation or warranty made by, or the accuracy, completeness, currentness, or sufficiency of any information provided (directly or indirectly through Oak Rock) by Client or any other person; the performance or observance by Client or any other person of any of the provisions of the Financing Agreements (or any of its other obligations in connection therewith); the financial condition of Client; or (except as otherwise expressly provided herein) any other matter relating to Client or any other person or any Participated Advances or the Financing Agreements." *Id.* ¶

4.4. ZFI represented and agreed with Oak Rock that ZFI had made its own independent credit analysis of Merchants Advance and would continue to do so and not rely on Oak Rock to make this credit decision or to provide documents and information sufficient for this credit analysis. *Id.* ¶ 4.5.

ZFI was given the right to terminate or renew the ZFI Alleged Participation Agreement for an additional one-year term "on the one year anniversary date." *Id.* ¶ 5.1. Upon the effective date of termination, Oak Rock was required to "repurchase from [ZFI] all of its Participations in Advances then outstanding at a price equal to: (a) [ZFI]'s Investment in the Advances then outstanding, plus (b) [ZFI's] share of all charges or interest earned on the Advances to such date." *Id.* ¶ 5.3(1)[1]. "Upon repayment by Oak Rock, [the ZFI Allegation Participation Agreement] [shall] terminate for all purposes and except as otherwise provided in [the ZFI Alleged Participation Agreement], each of the parties will be relieved of any liability to the other arising from any prior transactions hereunder." *Id.* If Merchants Advance was in default on the date of termination, "Oak Rock, in its sole discretion, may chose to liquidate the Participation through the orderly liquidation of the outstanding Advances, in which case, [ZFI] will receive from Oak Rock its proportionate share of the liquidation proceeds until such time as [ZFI] is paid in full." *Id.* ¶ 5.3(2).

The ZFI Alleged Participation Agreement provided that the "Agreement is intended by the parties hereto to effect an arms' length purchase by [ZFI] of the Participation and it is not to be construed as a loan or a commitment to make a loan by [ZFI] to Oak Rock." *Id.* ¶ 6.5.

---

[1] Because the ZFI Alleged Participation Agreement contains two "5.3" sections, the first "5.3" section will be referred to as "5.3(1)" and the second "5.3" section will be referred to as "5.3(2)."

C.    Bankruptcy Court Proceedings

On April 29, 2013, IDB, along with Bank Leumi USA and Bank Hapoalim B.M., filed a petition for involuntary relief under chapter 7 of the United States Bankruptcy Code against Oak Rock in the Bankruptcy Court. [Bankruptcy Docket, Docket Entry No. 1]. By Order dated May 6, 2013, the Bankruptcy Court converted the Bankruptcy Case from one under Chapter 7 to one under Chapter 11 of the Bankruptcy Code. [Bankruptcy Docket, Docket Entry No. 37].

Oak Rock commenced adversary proceedings against IDB, as agent, and certain of the Alleged Participants.[2] Supplemental Findings, at 1. All parties filed answers, cross-claims and counterclaims, and motions for summary judgment, oppositions thereto, replies and supplemental statements were filed in each of the Adversary Proceedings.

On March 27, 2014, the Bankruptcy Court read its decision on the summary judgment motions into the record [Bankruptcy Docket, Docket Entry No. 547], and issued written Supplemental Findings of Fact and Conclusions of Law on April 10, 2014 and Orders granting summary judgment in favor of IDB in the Adversary Proceedings related to this appeal on April 24, 2014.[3] The Bankruptcy Court ruled that certain agreements, which are not at issue on this appeal, were "true participation" agreements (*see* Supplemental Findings at 14, 18), but that the

---

[2]    The docket numbers and dates of initiation of the adversary proceedings are as follows: (1) May 30, 2013 (Adv. Pro. Index Nos. 8-13-08077, 8-13-08078, 8-13-08079), (ii) June 27, 2013 (Adv. Pro. Index Nos. and 8-13-08102, 8-13-08103), (iii) July 29, 2013 (Adv. Pro. Index No. 8-13-08119), and (iv) September 20, 2013 (Adv. Pro. Index Nos. 8-13-08154 and 8-13-08157) (collectively, the "Adversary Proceedings").

[3]    The Summary Judgment Orders (the "Summary Judgment Orders") and Supplemental Findings of Fact and Conclusions of Law (the "Supplemental Findings") are as follows: (i) Rothenberg Appellants, Adv. Pro. 13-08079 – Docket Entry Nos. 57-58; (ii) Appellant POS Funding, Adv. Pro. 13-08102 – Docket Entry Nos. 47-48; (iii) Guber Appellants, Adv. Pro. 13-08154 – Docket Entry Nos. 37; 39; (iv) Birnberg Appellants and Appellant Redstone, Adv. Pro. 13-08078 - Dkt. Nos. 63-64; (v) Yagerman Appellants, Adv. Pro. 13-08157 – Docket Entry Nos. 32-33; (vi) Cox Appellants, Adv. Pro. 13-08119 – Docket Entry Nos. 41-42, (vii) Brown Appellants, Adv. Pro. 13-08103 – Docket Entry Nos. 68-69, and (viii) Appellant ZFI, Adv. Pro. 13-08077 – Docket Entry Nos. 102; 106.

agreements entered into by the Appellants were not "true participation" agreements. *Id.* at 19-22.

The issue on each of these appeals is whether the Bankruptcy Court erred in granting IDB's motion for summary judgment and determining that the Appellants do not hold "true participations." Additionally, certain Appellants argue that the Bankruptcy Court should have denied summary judgment to IDB because the agreements are ambiguous.

II.     DISCUSSION

       A.      Standard of Review

       This Court has jurisdiction to hear appeals from judgments, orders, and decrees of a bankruptcy court. 28 U.S.C. § 158(a). On appeal from a bankruptcy court decision, a district court reviews a bankruptcy court's findings of fact for clear error. Fed. R. Bankr. P. 8013. Issues of law, as well as "mixed questions of law and fact," are reviewed *de novo*. *In re Vebuliunas*, 332 F.3d 85, 90 (2d Cir. 2003). "On appeal the district court…may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013; *see also In re Moreo*, 437 B.R. 40, 50 (E.D.N.Y. 2010). "On appeal to the district court from an order of the Bankruptcy Court granting summary judgment, the standard of review is *de novo*." *In re M. Silverman Laces, Inc.*, No. 01-civ-6209, 2002 WL 31412465, *3 (S.D.N.Y. Oct. 24, 2002).

       B.      Participation Agreements

       "Participation agreements are a form of multiple lender transaction[s]." *In re Okura & Co. (Am.), Inc.*, 249 B.R. 596, 607 (Bankr. S.D.N.Y. 2000). "A participation agreement is a commonly used financing device for splitting a loan between two or more lenders—the lead lender and the participants. Some of the primary reasons for participation agreements are the

allocation of risk for the lead bank, the participant's passive role in negotiations with the borrower, and diversification of a bank's portfolio." *In re Sackman Mortgage Corp.*, 158 B.R. 926, 931 (Bankr. S.D.N.Y. 1993). "Participations are not loans; they are contractual arrangements between a lender and a third party, in which the third party, or participant, provides funds to the lender. The lender, in turn, uses the funds from the participant to make loans to the borrower." *In re ACRO Bus. Fin. Corp.*, 357 B.R. 785, 787-88 (Bankr. D. Minn. 2006) (citing *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics)*, 269 F.3d 726, 736 (6th Cir. 2001)). "Under a participation agreement, the participant agrees to pay the lead lender for the lead lender's promise to transfer to the participant a like percentage of the underlying loan. In the typical participation, the lead lender transfers to the participant not only the benefits to be received from a share in the underlying loan (i.e. a *pro rata* share in the principal and interest payments) but also the risk of the borrower's default. The lead lender makes no warranties or guarantees about the borrower's ability to repay the loan or about the worth of the collateral in the event of default. If the borrower does default, the participant is entitled to a *pro rata* share of any monies received upon liquidation of the collateral, but it has no right of recourse against the lead lender." *In re Sackman Mortgage Corp.*, 158 B.R. at 932. If the agreements are "true participations," and thus sales rather than loans, "then the funds are effectively removed from the *res* of the estate." *In re Lendvest Mortgage, Inc.*, 119 B.R. 199, 200 (B.A.P. 9th Cir. 1990) (citing *Fireman's Fund Insurance Companies v. Grover (In re Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987)).

      1.     Interpreting Participation Agreements

     To determine whether an agreement is a true participation agreement or a disguised loan, courts "first look[] to the written agreement to discern the parties' intent, limiting [their] inquiry

12

to the words of the agreement itself so long as the agreement sets forth the parties' intent clearly and unambiguously." *In re Sackman Mortgage Corp.*, 158 B.R. at 932. Under New York law, the initial interpretation of a contract "is a matter of law for the court to decide." *Int'l Multifoods Corp. v. Commercial Union Ins. Co*, 309 F.3d 76, 83 (2d Cir. 2002) (citations omitted). "The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 412-13 (S.D.N.Y. 1994) (citing *Sayers v. Rochester Telephone Corporation Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)). An interpretation that gives a reasonable and effective meaning to all of a contract's terms is preferred to one that leaves a part unreasonable or of no effect. *Id.* at 413.

In interpreting a contract, the Court must first determine "whether the contract is unambiguous with respect to the question disputed by the parties." *Int'l Multifoods Corp.*, 309 F.3d at 83. Contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers*, 7 F.3d at 1095 (quoting *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). Contract language is ambiguous where it could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide*, 110 F.3d 898, 906 (2d Cir. 2007) (citations and quotations omitted). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). "Unless an

ambiguity is found and proof of the parties' subjective intent is proffered, the court will not look beyond the four corners of the contract when construing its meaning." *In re Sackman Mortgage Corp.*, 158 B.R. at 932. When the terms of a contract are ambiguous, extrinsic evidence, including evidence of industry custom or practice, may be considered to determine the parties' intent. *See Christiania General Insurance Corp. v. Great American Insurance Company*, 979 F.2d 268, 274 (2d Cir. 1992).

      2.     Test to Determine a "True Participation" from a "Disguised Loan"

Courts have developed two tests to determine whether a transaction is a true participation or whether it is in fact a disguised loan. The following factors indicate that a transaction is a true participation:

    1) money is advanced by participant to a lead lender;
    2) a participant's right to repayment only arises when a lead lender is paid;
    3) only the lead lender can seek legal recourse against the borrower; and
    4) the document is evidence of the parties true intentions.

*In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992).

However, "the relationship between a lead lender and a participant is characterized as debtor and creditor if the participation is in fact a loan (*In re Coronet Capital Co.*, 142 B.R. at 80) and the following factors indicate that a transaction is not in fact a participation, but rather a disguised loan:

    1) guarantee of repayment by the lead lender to a participant;
    2) participation that lasts for a shorter or longer term than the underlying obligation;
    3) different payment arrangements between borrower and lead lender and lead lender and participant; and,
    4) discrepancy between the interest rate due on the underlying note and interest rate specified in the participation.

*Id.*; *see also In re Sprint Mortgage Bankers Corp.*, 164 B.R. 224 (Bankr. E.D.N.Y. 1994).

"The most determinative factor of all of these is the risk allocation involved in the transaction. If the participant does not bear the same risk of loss as the seller, or if the seller has

made a guarantee of payment to the participant, the transaction is generally considered a loan and not a sale." *In re Corporate Financing, Inc.*, 221 B.R. 671 (Bankr. E.D.N.Y. 1998). "In a typical participation agreement, the lead lender makes no warranties or guarantees about the borrower's ability to repay the underlying loan. Thus, an indicium of a loan is the guarantee of repayment by the lead lender to a participant." *In re Sackman Mortgage Corp.*, 158 B.R. at 933. "[I]n cases considering whether financial transactions are true participations or disguised loans, the most important question is whether the alleged participant is subject to the risk of loss resulting from default by the underlying borrower. If the participant is not subject to that risk, the transaction is a loan to the participation seller, not a participation in the seller's loan to its borrower." *In re Brooke Capital Corp.*, No. 08-22789-7, 2012 WL 4793010, at *15 (Bankr. D. Kan. Oct. 5, 2012), *rev'd sub nom. S. Fid. Managing Agency, LLC v. Citizens Bank & Trust Co.*, No. 12-2702-JTM, 2014 WL 129336 (D. Kan. Jan. 14, 2014), *rev'd sub nom. In re Brooke Capital Corp.*, 588 F. App'x 834 (10th Cir. 2014). "Factors which may cause a transaction to be other than a true loan participation include anything that indicates the participants are not subject to the normal risks of ownership, such as guaranteed returns by the lead institution, or required repurchase agreements." *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987).

"Since a participation is, by its nature, contractual, the parties to a participation agreement may choose whatever terms they wish and the agreement will generally be enforced as to its terms." *In re AutoStyle*, 269 F.3d at 736. "Whether the parties intended outright sales or loans for security is determined from all the facts and circumstances surrounding the transactions at issues." *In re Golden Plan of California, Inc.*, 829 F.2d 705, 709 (9th Cir. 1986). "[M]erely looking to what the agreement names the transaction is an insufficient basis to support the finding of a participation agreement because, "[s]imply calling transactions 'sales' does not

make them so. Labels cannot change the true nature of the underlying transactions." *In re Woodson Co.*, 813 F.2d at 272. It is the economic substance of a transaction that should determine the rights and obligations of interested parties. *See Liona Corp., N.V. v. PCH Associates (In re PCH Associates)*, 804 F.2d 193, 199 (2d Cir. 1986).

    C.    Alleged Participation Agreements

        1.    Test for "True Participation" Agreements

            a.    Money Advanced by Participant to Lead Lender

The parties do not dispute that the first factor – that money was advanced by the Alleged Participants to Oak Rock – is satisfied here.

            b.    Participant's Right to Repayment

The second factor of the true participation test – whether a participant's right to repayment only arises when a lead lender is paid – hinges on the interpretation of Paragraphs 1 and 6 of the Alleged Participation Agreements. Paragraph 6 provides that "all compensation for the above transactions *as and when actually received* shall be divided between the parties hereto in proportion to their respective participating interest." Alleged Participation Agreements ¶ 6 (emphasis added). The Alleged Participants argue that "as and when actually received" refers to Oak Rock's receipt of payment on the underlying Dealer Loans, and that the Alleged Participant's right to "all compensation" was therefore conditioned on Oak Rock receiving payments on the underlying Dealer Loan. *See, e.g.*, [Docket 14-civ-3700, Docket Entry No. 6 ("Rothenberg Appellants Brief"), at 19-21]. On the other hand, IDB points to Paragraph 1 which provides for a set rate of return to be paid according to a set schedule and makes no mention of Oak Rock's receipt of funds from the underlying Dealer Loan. *See* [Docket 14-civ-3700, Docket Entry No. 9 ("IDB Brief"), at 17-20]. In response, the Alleged Participants argue that Paragraph

1 of the Alleged Participation Agreements, which provides for the interest rate payment schedule, must be read in conjunction with Paragraph 6, which states that "all compensation for the above transactions as and when actually received shall be divided between the parties hereto in proportion to their respective participating interest." Alleged Participation Agreements ¶ 6. The Alleged Participants argue Oak Rock's receipt of payment on the underlying Dealer Loans was a condition precedent to the Alleged Participants receiving Payment and thus the second prong of the true participation test – whether the Alleged Participants right to repayment only arose when Oak Rock was paid – is satisfied here and the Alleged Participants shared the same underlying risk as Oak Rock in the Dealer Loans. *See, e.g.*, [Docket 14-civ-3700, Docket Entry No. 10 ("Rothenberg Appellants Reply Brief"), at 3].

The Alleged Participation Agreements are ambiguous as to whether the Alleged Participant's right to repayment arose only when Oak Rock was paid. On the one hand, Paragraph 1 suggests that the Alleged Participants would be paid a set interest rate on a particular schedule, however Paragraph 6's language that all compensation would only be paid "as and when actually received" could be rendered superfluous if the Paragraph 1's interest payment schedule was not conditioned on Oak Rock's receipt of payments from the Dealers "as and when actually received." This ambiguity precludes a finding that the Alleged Participants were paid regardless of whether Oak Rock was paid on the Dealer Loans and precludes the granting of summary judgment. *See Long Island Airports Limousine Serv. Corp. v. Playboy-Elsinore Associates*, 739 F.2d 101, 103 (2d Cir. 1984) ("We do not suggest now how the clauses or language should be reconciled, only that they are not so clearly unambiguous as to be capable of disposition on summary judgment").

          c.        Legal Recourse Against the Borrower

As for the third factor – whether only the lead lender can seek legal recourse against the borrower – the Alleged Participation Agreements do not specifically state whether or not the Alleged Participants have recourse against the Borrower on the underlying Dealer Loan, however at least some of the agreements provide that "Oak Rock shall have and is hereby given, *the sole authority* for and on behalf of the parties hereto, to administer the [Loan Agreement / Agreement] in Oak Rock's name alone and the same shall be binding upon the parties hereto, provided however, that with respect to effecting collections, Oak Rock shall be deemed to be acting both for Oak Rock and with respect to Participant's interest in such transactions, for Participant as Participant's agent." Alleged Participation Agreements ¶ 2 (emphasis added). While not explicit, this language suggests that only Oak Rock has legal recourse against the borrower and therefore weighs in favor of finding a true participation agreement. Similar language has been found to give only the lender right to seek legal recourse against the borrower. *See In re Autostyle*, 269 F.3d at 738, n.3 (participation agreements stated that "[t]he account shall be conducted solely in [Lender's] name. [Lender] is entitled to make Advances as it deems fit under the Agreements. [Lender] shall have the right to take all actions and proceedings, judicial or otherwise that [Lender] may reasonably deem necessary or proper to protect the joint interests provided herein...").

          d.        Document is Evidence of Parties' True Intentions

The fourth factor – whether the Alleged Participation Agreements evidence the intent of Oak Rock and the Alleged Participants to create a true participation – weighs in favor of a finding of a true participation as the agreements are all entitled "Participation Agreements," refer to the Alleged Participants as "participants" and use terms that evidence a "participation" or

"sale" including Paragraph One (1) which states that "Oak Rock hereby grants, bargains, sells and assigns to Participant....a participating interest." Alleged Participation Agreement ¶ 1. However, "[s]imply calling transactions 'sales' does not make them so. Labels cannot change the true nature of the underlying transactions." *In re Woodson Co.*, 813 F.2d at 272. The fact that the Alleged Participation Agreements contain numerous references to terms such as "participation" or "sale" does not compel the conclusion that the documents are in fact participation agreements (*see In re Coronet Capital Co.*, 142 B.R. at 82 ("although the parties can call a document a "loan participation agreement", we are not obliged to make a holding that exalts substance over form")) though it does provide some evidence that the parties intended to enter into participation agreements. It does not appear that the Bankruptcy Court considered any extrinsic evidence of the parties' intentions in entering these agreements, but such evidence may help clarify whether the parties intended to enter into participation agreements or whether they intended to enter into loan transactions.

Therefore, three of the four *Coronet* factors weigh in favor of finding that the Alleged Participation Agreements are true participation agreements and the Alleged Participation Agreements are ambiguous as to the last factor.

      2.     "Disguised Loan" Test

           a.     Guarantee of Repayment by the Lead Lender to Participant

The first factor of the disguised loan test is whether the lead lender has guaranteed the participant's repayment or otherwise shifted the risk away from the creditworthiness of the lead lender's borrower to that of the lead lender itself. The "the risk allocation involved in the transaction" is the "most determinative factor" because if the Alleged Participants "[do] not bear the same risk of loss as [Oak Rock], or if [Oak Rock] has made a guarantee of payment to the

[Alleged Participants]" then the transactions will generally be considered to be loans rather than sales. *In re Corporate Fin., Inc.*, 221 B.R. at 679 (Bankr. E.D.N.Y. 1998). This issue is again tied up in the internal inconsistency between Paragraphs 1 and 6 of the Alleged Participation Agreements.

IDB argues that the Alleged Participants do not hold "true participations" because they did not share the same risk in the Dealer Loans as Oak Rock. *See* IDB Brief, at 17-20. IDB alleges that Paragraph 1 provides a guaranteed rate of return insofar as it gives the Alleged Participants a fixed rate of return with specified interest rate on a specified schedule, and that the exception in Paragraph 6 confirms that the Alleged Participants would receive this set amount as it states that: "on the principal amount of Participant's participating interest, compensation is to be paid at a rate per annum of [ ]%." Alleged Participation Agreements ¶ 6; IDB Brief, at 19. IDB argues that Paragraph 5, which provides that "each party hereto has no recourse whatsoever to the other party *excepting only for breach of this agreement*, breach of trust of malfeasance" (*id.* ¶ 5) (emphasis added) confirms that if Oak Rock failed to provide the promised rate of return according to the schedule set forth in Paragraph 1, it would be liable to the Alleged Participants for breach of contract. IDB Brief, at 18. IDB argues that this guarantee indicates that the Alleged Participants did not share the same risk as Oak Rock of default on the underlying Dealer Loans because the Alleged Participants could look to Oak Rock as another source of potential revenue as Oak Rock was contractually obligated to provide the guaranteed interest payments to the Alleged Participants on the schedule provided for in Paragraph 1, even in the event of default on the underlying Dealer Loan. IDB Brief, at 19-20. The Alleged Participations argue that there is no guarantee of payment anywhere in the Alleged Participation Agreements. *See, e.g.*, Rothenberg Appellants Brief, at 26.

While courts have found guaranteed interest payments by the lead lender to the participant to be indicative of a disguised loan rather than a true participation, in those cases, the guarantee was explicit and there were additional factors supporting a finding of a "disguised loan." *See, e.g., In re Woodson Co.*, 813 F.2d at 271 (court found agreements were not purchases and sales because the investment was "risk-free" as the agreement provided that investors were to be paid a guaranteed rate of interest monthly regardless of whether borrowers made their monthly payments to lender; in event of default, the lender paid the investor the interest and balance principal owed on the investor's "participation"; and lender purchased insurance policy to insure its contractual obligations to investors); *In re Coronet*, 142 B.R. at 80-81 ("agreement specifically provide[d]...that 'Coronet agrees to pay interest on the Senior Interest, at the Return Rate, during such period(s) of time as the Borrower shall not be current with respect to the payment of interest on the loan'" and "require[d] Coronet to repay the balances of the Senior Interest at the Return Rate to the Participant prior to Coronet's retention of any sums received at maturity.").

In *In re Corporate Financing*, the court found that despite the fact that there was a "'functional' guarantee of repayment because [lender] continued to pay investors their interest despite the fact that (unbeknownst to the individual investor) the underlying mortgagor had defaulted on its payments to the [lender]," there was no guarantee of repayment because "the explicit language of the [Agreement] makes no reference to a guaranteed repayment of the defendant's investments." *In re Corporate Financing*, 221 B.R. at 679-80. In that case, the Court contrasted "those instances where the courts have found that transactions constituted loans because the investment was guaranteed." *Id.* at 680 (citing *In re Woodson Co.*, 813 F.2d 266 (finding that transaction was loan based upon debtor's guarantee of monthly interest payments

regardless of underlying borrower's performance); *In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 229 (holding that investors had made loans to debtor because debtor's principal had executed personal guarantees for the investments); *In re Coronet Capital Co.*, 142 B.R. at 78 (relying upon guarantee of repayment to investor, court held investment was loan).

Where an investor receives "no contractual guarantee of repayment or compensation" in the case of the borrower's default, "[s]uch assumption of risk strongly suggests that the [] investors [are] not in a creditor-debtor relationship with [Lender]." *In re Golden Plan of California, Inc.*, 829 F.2d at 709-10. While "[a]n indicator of a disguised loan is a provision for the participant to be guaranteed repayment of its principal and interest before the lead lender is to receive its portion" (*In re Sackman Mortgage Corp.*, 158 B.R. at 935), the Alleged Participation Agreements do not unambiguously contain such a provision guaranteeing repayment of the Alleged Participant's principal and interest prior to Oak Rock receiving its portion. Whether Paragraph 1 provides for an implicit guarantee of payment by Oak Rock to the Alleged Participants is related to the ambiguity between Paragraphs 1 and 6 of the Alleged Participation Agreements – while Paragraph 1 sets out a specific payment schedule of interest payments, there is no explicit guarantee that Oak Rock will pay this amount to the Alleged Participants if it does not receive payments from the Borrowers on the underlying Dealer Loans. If Oak Rock's obligation under Paragraph 1 is conditioned on its receipt of payment from the Dealers provided in Paragraph 6, then it cannot be said that Oak Rock has guaranteed repayment in the event of default by the Dealers. The language of the Alleged Participation Agreements is ambiguous as to whether there was a contractual guarantee of a certain return to the Alleged Participants.

b.      Duration of Participation Agreement

As to the second factor – whether the participation lasts for a shorter or longer term than
the underlying obligation – the Alleged Participation Agreements "are for specified periods of
time that do not correlate to the underlying [Dealer Loans]." Supplemental Findings, at 21. The
fact that the Alleged Participation Agreements last for different periods of time than the
underlying loans is suggestive of a disguised loan. *See In re Sprint Mortgage Bankers Corp.*,
164 B.R. at 229 ("further indication that the transactions were loans is suggested by...the term of
the investments...Each assignment of mortgage to Plaintiffs stated that their "interest shall
definitely mature" one year from the date of the guarantee. However, each mortgage involved in
this case matured on a date other than the date on which Plaintiffs were entitled to repayment.");
*In re Corporate Financing, Inc.*, 221 B.R. at *680 ("When the transaction with the investor has a
stated term longer or shorter than the term of the underlying mortgage, this is an indication of a
loan and not of a participation").

Many of the Alleged Participants argue that the difference in duration between the
Alleged Participation Agreements and the underlying Dealer Loans is "immaterial" because the
Dealer Loans continued to be renewed and that whatever payment schedule was set forth in the
Alleged Participation Agreements, the obligation of Oak Rock to pay the Alleged Participations
was conditioned on the provisions of Paragraph 6 of the [Alleged Participation Agreements].
*See, e.g.*, Rothenberg Appellants Brief, at 27. The Alleged Participants argue that the
Bankruptcy Court erred in concluding that "the commencement dates of the participation
agreements do not correspond with the dates of the underlying loans, so once each participation
agreement expires, the Debtor is obligated to return the initial investment regardless of the status
of the underlying loans" (Supplemental Findings, at 21) because "the Bankruptcy Court

overlooked the qualification in Paragraph 6 of the participation agreements that Oak Rock's obligation to pay is conditioned on its receipt of the applicable funds from the Dealers. Thus, contrary to the Bankruptcy Court's finding, Oak Rock would not be obligated to repay any of the participations without first receiving payment from the underlying Dealer." Rothenberg Appellants Reply Brief, at 9.

While at this stage, the different durations of the Alleged Participation Agreements and the underlying Dealer Loans weighs in favor of finding that the agreements were loans rather than "true participations," the Alleged Participants' arguments need to be reevaluated after further consideration of the meaning of Paragraph 6.

c.      Different Payment Arrangements

The Bankruptcy Court found the third factor, differing payment arrangements between borrower and lead lender and lead lender and participant, to be very significant; the underlying Dealer Loans were all revolving loans and the Bankruptcy Court held that "[w]hen participating in a revolving loan agreement, that amount should fluctuate based on the amount of credit the Debtor provides, and the amount the Debtor collects from the underlying borrower on any given day. Such a relationship stands in stark contrast to what the [Alleged Participants] have in these cases, which is a fixed payment schedule with a specified interest rate, or a fixed interest rate with the repayment of principal at the end." Supplemental Findings, at 22. On appeal, the Alleged Participants argue that there is no caselaw supporting the proposition "that a participant contractually limiting the amount of capital it puts at risk in a participation agreement relieves the participant of or otherwise shifts its credit risk for the capital that has been invested" (Rothenberg Appellants Reply Brief, at 11) and that "[c]redit risk is not dependent upon the *amount* of principal invested. The risk of default by the Dealer remains constant whether or not

the [Alleged Participants] invested additional capital each time Oak Rock made an advance to a Dealer." *Id.* (emphasis in original).

While the Alleged Participation Agreements did not contain the "true-up" provisions found in some of Oak Rock's other participation agreements, which required advancement of additional funds if and when Oak Rock made subsequent advances in the revolving Dealer Loans, the Court is not aware of any authority suggesting this precludes a finding that the Alleged Participation Agreements are "true participations." In fact, the Sixth Circuit rejected a similar argument made by appellants in *In re Autostyle Plastics, Inc.* (*see* Final Reply Brief of Appellant, *In re Autostyle Plastics, Inc.*, 2000 WL 34432863 (arguing bankruptcy court erred in ruling that certain agreements were true participations in a revolving line of credit because, *inter alia*, the "a one-time, lump-sum payment…cannot represent an undivided, participating interest in a revolving line of credit" because under the revolver, the lender made continuous loans to the borrower and "[a] true participant in a revolving credit facility would continually fund its percentage portion of each loan and likewise receive its percentage portion of each repayment of principal and interest" but the "one-time advances were materially different loans than the [] revolving line of credit")) when it found that the agreements were valid participation agreements. *See In re AutoStyle Plastics, Inc.*, 269 F.3d 726 (finding agreements to be true participation agreements).

The fact that the underlying Dealer Loans were a revolving credit facility but the Alleged Participations did not contain "true-up" provisions may be suggestive of a loan but it is not determinative, as differing payment arrangements is just one factor to be considered. Moreover, there is evidence that other aspects of the payment arrangements between Oak Rock and the Dealers and between Oak Rock and the Alleged Participants were similar. *See, e.g.*, Rothenberg

Appellants Reply Brief, at 10 ("Each of the Dealer Loans required the Dealers to make monthly payments of interest....Similarly, the Participation Agreements required payments of interest each calendar month").

### d. Interest Rate Discrepancy

The fourth factor, discrepancy between the interest rate due on the underlying note and interest rate specified in the participation, is, after risk allocation, "[t]he second most important factor in determining whether a transaction is a loan or a sale of a...participation." *In re Corporate Financing*, 221 B.R. at 680. The Alleged Participants argue that there was a lower interest rate paid under the Alleged Participation Agreements than the Dealer Loans and this was to compensate Oak Rock for originating and servicing the Dealer Loans. *See* Rothenberg Participants Reply Brief, at 7-8. IDB does not respond to Appellants' arguments regarding the interest rate differential between the Alleged Participation Agreements and the Dealer Loans. *See* IDB Brief.

Some courts have suggested that a lower interest rate paid to a participant than that paid on the underlying loan is consistent with a true participation agreement because it represents the lead lender's fee for servicing or administrating the loans. *See In re Woodson Co.*, 813 F.2d at 272 (in a true participation, the difference between the interest rate paid by borrower and that provided to investor-participants would be based on a spread reflecting seller's reasonable charge for servicing the loans for investor-participants); *In re Sackman Mortgage Corp.*, 158 B.R. at 935 ("in a typical participation agreement, the participant pays the lead lender for administering the loan by a direct fee, an adjustment of the interest or both."); *In re Corporate Fin., Inc.*, 221 B.R. at 680 ("Agreements provided that the plaintiff would retain the difference between the (higher) rate paid by the mortgagor and the (lower) rate paid to the investor as compensation for servicing

the loan. This is another strong indication that the investments….were participations and not intended as loans directly to the plaintiff."). While the Alleged Participation Agreements do not explicitly state whether the difference in interest rates was intended as compensation to Oak Rock for servicing the loan, the "the difference between the interest rate that [Oak Rock] was charging [the Dealers] and the rate the [Alleged Participants] [were] to be paid under the [Alleged Participation Agreements] could have been intended to compensate [Oak Rock] for administering the loan." *In re Brooke Capital Corp.*, 2011 WL 204278, at \*8.

The Bankruptcy Court did not specifically address the interest rate discrepancy between the Alleged Participation Agreements and the Dealer Loans other than to state that the Alleged Participants argue that additional distinctions are immaterial "so long as (i) the interest rate on the participation agreement does not exceed the interest rate on the underlying loan…" Supplemental Findings, at 22. If there is a lower interest rate on an Alleged Participation Agreement than the corresponding Dealer Loan, this would weigh in favor of finding a true participation agreement, however if the interest rate is higher, this would weigh in favor of finding a "disguised loan." *See In re Brooke Capital Corp.*, 2011 WL 204278, at \*8 ("requirement that the lead lender pay interest to the participant at a higher rate than it was charging the underlying borrower would seem more suggestive of a loan from the 'participant' to the lead lender than a lower rate is.").

3. Summary Judgment was Improperly Granted

In light of the Alleged Participation Agreements' ambiguity with respect to key issues regarding whether the agreements are "true participations," particularly whether the Alleged Participation Agreements provided for a guaranteed payment to the Alleged Participants and/or whether the Alleged Participants' right to repayment only arose when Oak Rock was paid on the underlying Dealer Loans, the Bankruptcy Court erred in granting summary judgment. *See*

*Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys definite meaning."); *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) ("a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning."); *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 (2d Cir. 1983) ("where a contract is not wholly unambiguous, summary judgment must be denied even where both parties move for pre-trial resolution").

It is not clear whether the Bankruptcy Court considered any extrinsic evidence[4] to determine if such evidence could resolve the ambiguities or elucidate the intent of the parties (*see* [Docket 14-civ-3876, Docket Entry No. 14 ("Redstone Reply Brief"), at 5-6 ("all relevant extrinsic evidence should have been presented to the Bankruptcy Court in order for it to properly determine what Oak Rock and [the Alleged Participants] intended")]; *U.S. ex rel. Keller Painting Corp. v. Torcon, Inc.*, No. 12-civ-1061, 2014 WL 6769234, at *8 (E.D.N.Y. Nov. 29, 2014) ("Although a determination that a contract is ambiguous usually requires the court to deny summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary" (internal citations omitted))), or whether additional discovery was necessary to assist in the interpretation of these agreements. *See, e.g.*, Rothenberg Appellants Brief at 6 ("No discovery took place prior to the filing of the summary judgment motions"). The Bankruptcy Court's decision is reversed as to the Alleged Participation

---

[4]     Some potential extrinsic evidence has been pointed out in the Appellants' briefs, such Oak Rock's audited financial statements which excluded the "participations sold" from Oak Rock's Loan Receivables, and the testimony of Clifford Zucker, Chief Restructuring Officer of Oak Rock, that the participations agreements were not the property of the Debtor's estate. *See* Zucker Decl. ¶ 13

Agreements as the ambiguity in those Agreements precluded granting summary judgment to IDB on the issue of whether the Alleged Participation Agreements were "true participations."

      D.      ZFI Alleged Participation Agreement

          1.      Jurisdiction over the ZFI Appeal

IDB argues that this Court does not have jurisdiction over ZFI's appeal because the ZFI Adversary Proceeding is still pending and thus ZFI's appeal is an interlocutory appeal. IDB Brief, at 3. ZFI argues that the appeal does arise from a "final" judgment, order or decree and thus is appealable, or in the alternative, the Court should grant leave to appeal. [Docket 14-civ-3874, Docket Entry No. 11 ("ZFI Reply Brief"), at 2-5].

"Bankruptcy court rulings are appealable to the district courts pursuant to 28 U.S.C. § 158(a), which gives the district court jurisdiction to review both final determinations, and, with leave, interlocutory orders of the bankruptcy court." *First Fidelity Bank. N.A., New Jersey v. Hooker Investments. Inc. (In re Hooker Investments, Inc.)*, 937 F.2d 833, 836 (2d Cir. 1991). "For appeals 'of right' a district court only has jurisdiction to hear appeals from 'final judgments, orders, and decrees.'" *Ades–Berg Investors v. Breeden (In re Bennett Funding Group. Inc.)*, 439 F.3d 155, 159–60 (2d Cir. 2006) (quoting 28 U.S.C. § 158(a)(1)).

The Second Circuit has held that:

> The standards for determining finality in bankruptcy differ from those applicable to ordinary civil litigation. The need for different standards arises from the fact that a bankruptcy proceeding is umbrella litigation often covering numerous actions that are related only by the debtor's status as a litigant and that often involve decisions that will be unreviewable if appellate jurisdiction exists only at the conclusion of the bankruptcy proceeding. We have thus recognized that Congress intended to allow for immediate appeal in bankruptcy cases of orders that finally dispose *of discrete disputes within the larger case.*

*In re Bennett Funding Group. Inc.*, 439 F.3d at 160 (quoting *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1283 (2d Cir. 1990) (emphasis in original; internal quotation marks and citations omitted)); *see also Cor Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 466 F.3d 75, 77–78 (2d Cir. 2006) ("A more flexible concept of 'finality' is applied in the bankruptcy context than in appeals of ordinary civil litigation, such that orders in bankruptcy cases may be appealed if they finally dispose of discrete disputes within the larger bankruptcy case." (quotations, brackets and citation omitted)). "[A] 'dispute,' for appealability purposes in the bankruptcy context, means at least an entire claim on which relief may be granted." *In re Bennett Funding Group. Inc*, 439 F.3d at 160 (quoting *Shimer v. Fugazy (In re Fugazy Exp., Inc.)*, 982 F.2d 769, 775-76 (2d Cir. 1992)). "[F]or a bankruptcy court order to be final...the order need not resolve all of the issues raised by the bankruptcy but it must completely resolve all of the issues pertaining to a discrete claim..." *In re Fugazy Exp., Inc.*, 982 F.2d at 776; *see also Quigley Co., Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 51 (2d Cir. 2012) (holding that final orders in bankruptcy cases are "orders that finally dispose of discrete disputes within the larger case" (quotations and citation omitted)).

Although the Bankruptcy Court's April 24, 2014 Orders resolved a discrete dispute within the larger bankruptcy case – whether certain agreements constitute "true participations" or "disguised loans," the April 24, 2014 Orders did not terminate the Adversary Proceeding in the ZFI case as there are apparently claims still pending in that Adversary Proceeding.[5] "Because

---

[5]     In the Adversary Proceeding (13-8077), ZFI also asserted cross-claims against IDB for unjust enrichment (seventh claim) and tortious interference (eighth claim) and equitable subordination (ninth claim) [Adv. Pro. 13-8077, Docket Entry No. 14] but in its notice of motion for summary judgment requested an order entering summary judgment in favor of ZFI only with respect to the first through sixth claims for relief in ZFI's Counterclaim, Cross-Claim and Third-Party Complaint [Adv. Pro. 13-8077, Docket Entry No. 61, at 4] and thus it appears that ZFI's seventh through ninth claims in the Adversary

there are claims still pending…in the adversary proceeding, [the] order was not a final judgment, and therefore, the appeal is interlocutory." *Fischer v. 47th St. Photo, Inc.*, No. 92-civ-6529, 1993 WL 126525, at *2 (S.D.N.Y. Apr. 22, 1993); *see also In re Chateaugay Corp.*, 922 F.2d 86, 90 (2d Cir. 1990) ("[a]n order granting partial summary judgment is interlocutory" (citing *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 742-43, 96 S.Ct. 1202, 1205-06, 47 L.Ed.2d 435 (1976))); *Matter of Wood & Locker, Inc.*, 868 F.2d 139, 144 (5th Cir. 1989) ("no appeal may be taken from a bankruptcy court order that adjudicates fewer than all of the claims or the rights and liabilities of fewer than all of the parties in an adversary proceeding absent Rule 54(b) certification-even if the order would be considered final if it arose in another context"); *In re Hawker Beechcraft, Inc.*, No. 12-misc-11873, 2013 WL 6673607, at *4 (S.D.N.Y. Dec. 18, 2013) (Bankruptcy Court's decision was not a final order where "the adversary proceeding remain[ed] open"); *Brooks Fashion Stores, Inc. v. Wainscott Sportswear, Inc.*, No. 96-civ-0362, 1996 WL 221591, at *1 (S.D.N.Y. May 1, 1996) ("Order did not resolve the entire adversary proceeding" and therefore, "the partial summary judgment [was] an interlocutory order").

ZFI urges the Court to exercise its discretion to grant leave to appeal pursuant to 28 U.S.C. § 158(a)(3) which provides that "interlocutory orders and decrees" may be appealed "with leave of the court." 28 U.S.C. § 158(a)(3). "In exercising their discretion as to whether to grant leave to appeal an interlocutory order in a bankruptcy case, district courts have generally applied the standards set forth in 28 U.S.C. § 1292(b)." *In re Hawker Beechcraft, Inc.*, 2013 WL 6673607, at *4. Thus, to determine whether leave to appeal an interlocutory order should be granted, a district court considers whether: (1) "such order involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion" and (3) "an

---

Proceeding remain pending and ZFI allegedly "continues to prosecute [them]…by, among other things, serving interrogatories on IDB." IDB Brief, at 3.

immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see In re Cutter,* No. 05-civ-5527, 2006 WL 2482674, at *3 (E.D.N.Y. Aug. 29, 2006) (stating that, while neither § 158 nor the Bankruptcy Rules "provides guidelines for determining whether a district court should grant leave to appeal...most district courts in the Second Circuit have applied the analogous standard for certifying an interlocutory appeal from a district court order, set forth in 28 U.S.C. § 1292(b)" (citations omitted)). It is in the district court's "discretion" to "permit an appeal to be taken from such order." 28 U.S.C. § 1292(b). "[L]eave to appeal from interlocutory orders should be granted only in exceptional circumstances [that]...overcome the general aversion to piecemeal litigation and justify departing from the basic policy of postponing appellate review until after the entry of a final judgment." *Picard v. Estate of Madoff,* 464 B.R. 578, 582-83 (S.D.N.Y. 2011) (citation and quotation omitted); *see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 921 F.2d 21, 25 (2d Cir. 1990) (stating that "only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment" (internal citations omitted)).

Under the first prong, a "controlling question of law exists if: (1) reversal of the...court's opinion could result in dismissal of the action, (2) reversal of the...court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *In re Lloyd's Am. Trust Fund Litig.,* 96-civ-1262, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997) (citing *Klinghoffer,* 921 F.2d at 24. Here, the question is a question of law – review of the Bankruptcy Court's granting of summary judgment on the meaning of agreements – and the question is controlling because "[a]lthough a reversal here would not result in dismissal of the adversary proceeding, it would

undoubtedly significantly affect the conduct of the adversary proceeding" (*In re Hawker Beechcraft, Inc.*, 2013 WL 6673607, at \*4) because whether the ZFI Alleged Participation Agreement is a true participation agreement or a disguised loan will impact the ZFI Adversary Proceeding.

Under the second prong, there may be "substantial ground for difference of opinion" with respect to the legal issue presented for interlocutory appeal when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *In re Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at \*5 (citing *Klinghoffer*, 921 F.2d at 25). Here, the issue presented on appeal regarding the distinction between true participation agreements and disguised loans is complex and as multiple parties have noted, there is scant caselaw on the issue (*see* Rothenberg Appellants Brief at 18 ("There are also only a handful of cases around the country dealing with the issue, and none by the Second Circuit"); *see* [Docket 14-civ-3876, Docket Entry No. 5 ("Redstone Brief"), at 8 ("The Second Circuit has not yet provided controlling authority as to what is necessary to prove a true loan participation.")], thus, the second section 1292(b) factor is satisfied.

Finally, with respect to the third factor, whether an immediate appeal from the order may materially advance the ultimate termination of the litigation, withholding leave to appeal would not only prejudice ZFI but it would delay the ultimate resolution of an important issue in the bankruptcy – whether the Appellants hold true participations or disguised loans. Thus, ZFI has shown that "exceptional circumstances" warrant a departure from the policy against interlocutory appeals because granting ZFI leave to appeal would prevent unduly delay and piecemeal litigation on the important issue of whether Appellants hold true participations or disguised loans.

33

2.    ZFI Alleged Participation Agreement

The Bankruptcy Court found that while the ZFI Alleged Participation Agreement

"contains the four requirements of a participation agreement enunciated in *Coronet Capital Co.*,

it also contains characteristics of an unsecured loan or investment under applicable caselaw" and

therefore granted summary judgment in favor of IDB and against ZFI. Supplemental Findings,

at 19. However, consideration of the factors distinguishing a disguised loan from a participation

agreement indicates that the ZFI Alleged Participation Agreement is a true participation

agreement and not a disguised loan.

The Bankruptcy Court found that the ZFI Alleged Participation Agreement's "one year

term limit put[] the risk of loss of the transaction on the Debtor, which must provide ZFI with a

full return of its $1 million investment at the end of the one year term, no matter how the

Merchants Advance Loan performed." Supplemental Findings, at 19. The Bankruptcy Court

focused solely on Paragraph 5.3(1), which allows ZFI to terminate the Agreement at the end of

its one-year term and obligates Oak Rock to repurchase ZFI's interest (*see* ZFI Alleged

Participation Agreement ¶ 5.3(1)), but ignored Paragraph 5.3(2), which provides that

"notwithstanding the provisions of Paragraphs 5.1, 5.2 and 5.3...if [Merchants Advance] [was]

in default on the date of termination, Oak Rock, in its sole discretion, [could] chose to "liquidate

the Participation through the orderly liquidation of the outstanding Advances, in which case

[ZFI] [would] receive from Oak Rock its proportionate share of the liquidation proceeds until

such time as [ZFI] [was] paid in full." *Id.* ¶ 5.3(2). This provision makes clear that Oak Rock

was *not* obligated "to provide ZFI with a full return of its $1 million investment at the end of the

one year term, no matter how the Merchants Advance Loan performed" (Supplemental Findings,

at 19), but could, if the Merchants Advance Loan was in default, choose to liquidate the loan and

ZFI would only receive its proportionate share of the liquidation proceeds. Therefore, ZFI and Oak Rock proportionally shared the risk of default by Merchants Advance, the underlying borrower. *See In re Sackman Mortgage Corp.*, 158 B.R. at 932 ("[i]n the typical participation, the lead lender transfers to the participant not only the benefits to be received from a share in the underlying loan (i.e. a *pro rata* share in the principal and interest payments) but also the risk of the borrower's default...If the borrower does default, the participant is entitled to a *pro rata* share of any monies received upon liquidation of the collateral, but it has no right of recourse against the lead lender."); *In re Brooke Capital Corp.*, 2012 WL 4793010, at *15 ("in cases considering whether financial transactions are true participations or disguised loans the most important question is whether the alleged participant is subject to the risk of loss resulting from default by the underlying borrower"). Section 5 of the ZFI Alleged Participation Agreement provided no guarantee of repayment by Oak Rock to ZFI if Merchants Advance defaulted on the underlying loan, which is consistent with other provisions in the Agreement. *See* ZFI Alleged Participation Agreement ¶ 4.4 (Oak Rock "does not guarantee the repayment of any Participated Advance...").

As to "[t]he second most important factor in determining whether a transaction is a loan or a sale of a...participation" (*In re Corporate Financing*, 221 B.R. at 680), there was no discrepancy in interest rates as "the lowest rate of return to which Oak Rock was entitled on the Merchants Advance Loan was 13.0%" and "ZFI was also entitled to receive a fixed rate of 13.0% on its participation in the Merchants Advance Loan – equal to or lower than the rate received by Oak Rock" and thus ZFI "never stood to receive a higher rate of return than did Oak Rock." [Docket 14-3874, Docket Entry No. 6 ("ZFI Brief"), at 19]. The Bankruptcy Court did not discuss this factor.

The Bankruptcy Court also relied upon the fact that the terms of the ZFI Alleged Participation Agreement do not match the terms of the Merchants Advance Loan because the agreements had different commencement dates and there was no requirement in the ZFI Alleged Participation Agreement for purchases of like participations in subsequent advances or periodic reconciliations between the Debtor and ZFI to reflect the payments and drawdowns on the underlying loan. Supplemental Findings, at 19. However, as noted *supra* in Section II.C.2.c., the Court is not aware of any authority suggesting that the lack of a "true-up" provision in a participation agreement in a revolving loan precludes finding the agreement is a true participation. Moreover, the absence in the ZFI Alleged Participation Agreement of the "true-up" provision found in some of Oak Rock's other participation agreements is not fatal to finding that the ZFI Alleged Participation Agreement is a true participation because "a participation is, by its nature, contractual, [and] the parties to a participation agreement may choose whatever terms they wish and the agreement will generally be enforced as to its terms." *In re AutoStyle*, 269 F.3d at 736.

Based upon the foregoing, the ZFI Alleged Participation Agreement should be enforced according to its terms. The parties chose to create a participation agreement as the language of the agreement demonstrates that ZFI would be paid only when Oak Rock was paid by Merchants Advance (*see* ZFI Alleged Participation Agreement ¶ 3.4), the parties shared the risk of a Merchants Advance default as ZFI was not guaranteed full repayment but only its proportionate share of the liquidation proceeds in the event of a default (*see id.* ¶¶ 3.5, 4.4, 5.3(2)), and the agreement unambiguously evidences the parties' intent to create a true participation agreement. *See id.* ¶ 6.5 ("This Agreement is intended by the parties hereto to effect an arms' length purchase by Participant of the Participation and it is not to be construed as a loan or a

commitment to make a loan by Participation to Oak Rock."). Because the ZFI Alleged Participation bears all the hallmarks of a true participation agreement and none of the disguised loan factors provide a basis to recharacterize the agreement as a disguised loan, the ZFI Alleged Participation Agreement is a true participation agreement and the Bankruptcy Court erred in granting summary judgment to IDB rather than to ZFI on this issue.

III.     CONCLUSION

The Court has considered the parties' submissions in their entirety. For the foregoing reasons, the Order of the Bankruptcy Court is reversed as to the ZFI Alleged Participation Agreement as summary judgment should have been entered in favor of ZFI and against IDB on the issue of whether ZFI has a true participation agreement, and reversed as to the Alleged Participation Agreements as the ambiguity in those Agreements precluded granting summary judgment to IDB on the issue of whether the Alleged Participation Agreements were true participations. The matter is remanded to the Bankruptcy Court for further proceedings consistent with this Order.

**SO ORDERED.**

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: March 31, 2015
         Central Islip, New York